**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

UNITED STATES OF AMERICA,

     Plaintiff,

v.                        Criminal Action No. 3:15cr155-ALL

MANVEL AVAGYAN,
DAVIT G. GHAZARYAN, and
HRAYR MARGARYAN

     Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on several related motions: Defendants Ghazaryan and Margaryan's MOTION TO SUPPRESS EVIDENCE WITH INCORPORATED REQUEST FOR FRANKS HEARING (Docket No. 37), Defendants Ghazaryan and Margaryan's SUPPLEMENTAL MOTION TO SUPPRESS (Docket No. 59), Defendants Ghazaryan and Margaryan's SECOND SUPPLEMENTAL MOTION TO SUPPRESS (Docket No. 70), Defendant Avagyan's MOTION TO SUPPRESS EVIDENCE WITH INCORPORATED REQUEST FOR FRANKS HEARING (Docket No. 39), and Defendant Avagyan's SUPPLEMENTAL MOTION TO SUPPRESS (Docket No. 58). For the reasons stated below, Ghazaryan and Margaryan's motions have been denied (Order, Docket No. 75), and Avagyan's motions have been granted in part and denied in part. (Order, Docket No. 77).

1

## BACKGROUND

### A. Factual Background

#### 1. Ghazaryan, Margaryan, and the Honda Van

On the afternoon of April 21, 2015, a member of the Wells Fargo Bank security staff reported to the Spotsylvania County Sheriff's Office that "three Middle Eastern males" were observed making several trips between a Wells Fargo Bank, a PNC Bank, and a Honda van in the parking lot of Hilltop Shopping Center — behavior that the security staff considered to be inconsistent with normal bank use. (Tr. 36:6-44:5; 130:12-2). The report from the Wells Fargo Bank staff provided a description of the Honda, including a license plate number. (Defendants Ghazaryan and Margaryan's Mtn. to Suppress Evidence with Incorporated Request for Franks Hrg., Docket No. 37, 2 ("G/M Suppression Mem."); Gov't's Resp. in Opp., Docket No. 44, 1 ("Gov't's Suppression Resp."); Tr. 36:6-37:11; 44:9-10). The dispatcher[1] for the sheriff's office relayed this information over the radio, and in

---

[1] None of the deputies could testify as to when the information came in to dispatch. (Tr. 91:8-92:5). Defendants insinuated that the information might have been several hours old when went out to Hanrahan and the other officers, and Hanrahan agreed that it was possible that the information might have been several hours stale, but Defendants presented no evidence on this front.

2

so doing identified the source of the information as a Wells Fargo Bank security official. (Tr. 36:6-25; 153:10-24).

Having received the dispatch,[2] Deputy Hanrahan was dispatched to Hilltop Shopping Center, where he found a car matching the description and bearing the license plates that had been reported to the dispatcher. (Tr. 44:7-47:6).[3] Hanrahan approached the vehicle from the driver's side and observed, through a partially rolled-down window, Ghazaryan and Margaryan eating. (Tr. 47:13-48:2).[4] The windows of the sliding doors and the rearmost windows were heavily tinted, and, even through the partially opened front window, Hanrahan could not clearly see the back rows of the van. (Tr. 48:3-21; 83:21-25; 95:5-95:6; 210:4-7). Thus, Hanrahan was unable to confirm whether a third person was in the van. Hanrahan asked Ghazaryan and Margaryan what they were doing in the area and informed them about the contents of the dispatch call. (Tr. 49:3-50:1). Ghazaryan denied

---

[2] Neither Hanrahan nor any other deputy personally observed any of the Defendants at the banks. (Tr. 81:22-81:1).

[3] In their original briefs, Defendants stated that Hanrahan blocked the Honda in with his vehicle. (G/M Suppression Mem. 2). The Government stated that Hanrahan's car was "15-20 feet away from the back of the Honda." (Gov't's Suppression Resp. 2). The Government's position was borne out by Hanrahan's uncontroverted testimony at the original hearing. (Tr. 47:7-12).

[4] Defendants' original brief mentioned that Hanrahan had his hand on his gun when he approached (G/M Suppression Mem. 2), but this was not borne out by the record.

3

having been at the banks and denied being with a third person. (Tr. 50:2-23; Gov't's Suppression Resp. 2; G/M Suppression Mem. 2).

During Hanrahan's inquiry, Deputy Davies arrived on the scene and approached the van from the passenger side. (Tr. 51:9-13; 84:8-10; 131:5-22). Like Hanrahan, Davies also was unable to see into the back of the van because of the heavy window tinting. (Tr. 131:23-132:25; 133:1-134:12; 161:20-162:5). Davies asked Ghazaryan and Margaryan if there was a third person in the van, and was told that there was not. (Tr. 133:1-134:12). Davies expressed his concern to Ghazaryan and Margaryan that he had received reports of three, not two, men associated with the van. (Tr. 133:1-134:12). Given the heavy window tint and the reports of a third person, Davies was concerned for his safety and that of his fellow officer, Hanrahan. (Tr. 160:6-161:15). Davies twice asked Margaryan if he could open the van and twice received an affirmative answer. (Tr. 134:12-19). Davies stated that the van door opened automatically before he could pull on the door. (Tr. 134:23-25).[5] With the door opened, Davies saw an

---

[5] Defense counsel suggested that Davies might have pressed a button to open the door, rather than Margaryan opening the door from a button inside, or that Davies' testimony on the subject is otherwise incredible. (Tr. 141:5-143:5; 149:20-151:20; 159:16-160:5; 162:8-11; 166:8-12; 219:2-220:8; 223:17-225:10). For reasons stated below, this is irrelevant. In any case, there

4

open plastic shopping bag on the floor behind the front passenger seats. (Tr. 135:1-6; 162:12-165:3). Without manipulating the bag, Davies could see into[6] the bag, where he observed pieces of cut-up "silver metallic" plastic cards, cut-up magnetic strips, and cut-shredded pieces of paper. (Tr. 137:7-15).[7] Davies also observed a cell phone in the back of the van. (Tr. 137:18-24). When Davies asked Ghazaryan and Margaryan where their cell phones were, they each held up a phone. (Tr. 137:18-24). Ghazaryan subsequently claimed that the phone in the back of the car was also his phone. (Tr. 137:24-138:5).[8] Recognizing that the contents of the bag were likely the tools

---

is no testimony to contradict Davies's testimony. Hanrahan could not testify as to the circumstances surrounding the opening of the door. (84:15-86:5; 93:19-96:11; 155:4-158:15).

[6] Defense counsel insinuated that it would be difficult to see cards, cut-up cards, and cut-up receipts through a typical plastic bag. (Tr. 227:12-231:19). This is irrelevant because Davies testified that he looked down into an open bag, rather than through a closed bag. His testimony on that score was not rebutted.

[7] Hanrahan lacked personal knowledge about how Davies obtained the bag. (Tr. 86:9-23).

[8] Davies' interactions with Ghazaryan and Margaryan, from the time that he walked up to the van to the time that he asked men about their phones, occurred before Hanrahan left to run Defendants' identification. (Tr. 138:7-8).

and results of a process known as credit card skimming,[9] Davies removed the plastic bag from the Honda. (Tr. 138:15-19).

Hanrahan asked Ghazaryan and Margaryan for identification, which both men produced. (Tr. 52:15-18). Both men produced Brooklyn, New York licenses. (Tr. 53:17-19; 55:20-24). Ghazaryan also produced a New York State Highway Patrol Police Benevolent Association card, which Hanrahan interpreted as an attempt to deflect suspicion. (Tr. 52:20-22, 55:14-19). After examining the New York licenses, Hanrahan asked Ghazaryan what he was doing in Spotsylvania County; Ghazaryan advised Hanrahan that he was looking to buy cars to resell. (Tr. 55:25-56:11). Hanrahan found this suspicious because Hilltop Shopping Center was out of the way for interstate travelers and not in the vicinity of used car lots. (Tr. 56:12-58:5).[10] Hanrahan took defendants' driver's licenses to his squad car so that he could "run their information." (Tr. 58:6-62:11). Ten to fifteen minutes passed

---

[9] Davies knew that credit card skimming can be carried out by placing a skimming device over a card reader, allowing the skimmer to collect card data, collecting the skimming device, and then using the data obtained from the skimmer to program blank cards. (Tr. 130:2-11).

[10] Defendants dispute that their location was out-of-the-way, and state that their location was consistent with their stated intention of purchasing used cars. (Defendants Ghazaryan and Margaryan's Supp. Reply, Docket No. 64, 4-5) ("G/M Supp. Reply").

while Hanrahan attempted to navigate the New York City Police Department's information clearing houses. (Tr. 62:4-16; 98:20-101:6).

While Hanrahan was in the process of running Ghazaryan and Margaryan's information, Davies approached Hanrahan with the white plastic bag that he had taken from the van. (Tr. 62:18-25). Davies showed Hanrahan that the bag contained torn up ATM receipts, blank gray credit cards, and cut-up credit cards (Tr. 64:3-8). Hanrahan and Davies each independently believed these materials to be evidence of credit card skimming. (Tr. 66:3-68:3; 140:12-22).

Hanrahan received a call that a possible third related individual had been observed at Scafa's Restaurant, which was nearby but was across the parking lot. (Tr. 68:8-25). As will be discussed subsequently, that person, Avagyan, was later brought to Hanrahan's location. Before Avagyan arrived, Deputy Fuller arrived and began watching Ghazaryan and Margaryan, who were still in the van. (Tr. 71:12-22;169:17-171:14). Ghazaryan persisted in moving his hands even after Fuller asked him to stop, so Hanrahan asked Ghazaryan to step out of the van and Ghazaryan complied. (Tr. 71:23-72:19; 125:16-126:8; 171:15-175:5; 225:17-25). Hanrahan placed Ghazaryan in handcuffs. (Tr. 71:23-72:19; 125:16-126:8; 171:15-175:5; 225:17-25). Hanrahan

7

advised Ghazaryan that he was being detained and that he (Hanrahan) would pat Ghazaryan down for weapons. (Tr. 72:20-73:4). Next, Hanrahan asked Ghazaryan if he (Hanrahan) could search Ghazaryan. (Tr. 72:20-73:4). Ghazaryan assented. (Tr. 73:2-73:4). The search yielded several blank gray[11] credit cards identical to those that were found in the white plastic bag that Davies had removed from the van. (Tr. 73:10-76:1). Margaryan was handcuffed and detained more or less contemporaneously. (Tr. 76:3-7). Both men were placed in squad cars and informed that they were officially under arrest. (Tr. 76:3-20;176:22-178:1). At some point after defendants were removed from the Honda, Detective Rickens[12] gave <u>Miranda</u> warnings to Ghazaryan and Margaryan. (Tr. 212:25-213:2).

After Ghazaryan and Margaryan were placed under arrest, the deputies began to search the Honda. Detective Rickens was on the phone with the Commonwealth's Attorney while the deputies were searching the Honda and, on the Commonwealth's Attorney's advice, Rickens instructed the deputies to stop searching the car until they obtained a warrant. (Tr. 76:19-25; 151:24-152:17;

---

[11] Hanrahan and Davies alternately described the cards as silver or gray. The Court does not consider this to be a material discrepancy.

[12] Detective Rickens arrived sometime before this point, when Ghazaryan and Margaryan were still in the Honda. (Tr. 209:24-210:1).

175:19-21; 210:21-213:6). Rickens obtained a search warrant for the van the next day. (Tr. 213:20-22).

## 2. Avagyan

While Hanrahan and Davies detained Ghazaryan and Margaryan, other officers went door to door in the shopping center attempting to find the missing third suspect, described as a "male, possibly Hispanic or Middle Eastern," with "an approximate build of about six-foot, medium build" and "possibly wearing a camouflage shirt. (Tr. 186:20-188:22). At some point, an unspecified "passerby" reported to the sheriff's office that the third suspect might be located at Scafa's Restaurant. (Gov't's Suppression Resp. 5). After receiving that tip, Deputy Horn went to Scafa's Restaurant, encountered Avagyan, and informed Deputy Basil and Captain Pearce that he (Horn) believed that he had located the third suspect. (Tr. 188:22-189:3; 200:19-20). Basil and Pearce went to Scafa's. (Tr. 188:22-189:3; 200:19-20).[13] Avagyan appeared to Basil to meet the physical description of the third subject. (Tr. 200:5-202:12).[14] Although

---

[13] Hanrahan estimated that it was 250 yards from Scafa's to the location of the Honda van where the other officers were located. (Tr. 114:19-22).

[14] Defense counsel argued that Avagyan's driver's license states that Avagyan is only 5'4. (Tr. 200:8-18). As the Court noted, however, Avagyan actually appears significantly taller than 5'4. (Tr. 236:20-237:15), closer to six feet.

Basil testified that "Deputy Horn advised [the other deputies that] the subject's actions made him very suspicious of the individual," Basil could not testify as to the actions that Horn had observed, and Horn did not testify at the suppression hearing. (Tr. 201:2-204:13). At the time that the deputies escorted Avagyan out of Scafa's, the deputies did not have any facts that linked Avagyan to the Honda or to its occupants. (Tr. 206:2-206:6). It was their intent to determine whether Avagyan appeared in the surveillance footage from the cameras at Wells Fargo Bank and PNC Bank. (Tr. 206:2-206:6).

Horn and Basil handcuffed Avagyan, asked him to step outside, took him to Basil's police car some 100 yards away, and searched him. (Tr. 189:15-190:4). Basil could not recall whether he asked or received permission to search Avagyan. (Tr. 204:25-205:1). The search of Avagyan's person yielded $194 in cash and Avagyan's wallet. (Tr. 190:4-17; 194:10-12; 205:6-9). The wallet contained Avagyan's driver's license and a note in a foreign language. (Tr. 190:4-17; 194:10-12; 205:6-9). After finding the note, but before finding the cash, Basil gave Avagyan the standard Miranda warnings. (Tr. 190:3-191:25). Avagyan stated that the letter was from a relative overseas; that he had arrived in the area in a sedan; and that he was in the area alone. (Tr. 192:1-193:22). Basil placed Avagyan in his squad car

10

and drove Avagyan to the location of the Honda, the other officers, and Ghazaryan and Margaryan. (Tr. 195:5-11). En route, Avagyan saw Ghazaryan and Margaryan in handcuffs, and asked why his friends were in handcuffs. (Tr. 195:14-20). Rickens again issued Miranda warnings to Avagyan. (Tr. 196:13-15). Avagyan initially indicated that he did not wish to speak further with the officers. (Tr. 196:13-15). Subsequently, however, he indicated that he wished to speak with Basil again, and asked what was going on. (Tr. 196:24-197:10). Basil advised Avagyan that Avagyan was detained as a result of suspicious activity. (Tr. 196:24-197:10). Basil asked Avagyan how he knew Ghazaryan and Margaryan. (Tr. 197:10-14). Avagyan responded that he did not know them, but that he had met them in a church in New York a day or two earlier. (Tr. 197:10-14). Avagyan also said that he was a truck driver, and that he made the $194 in cash by working at a car wash in New York. (Tr. 197:15-22). At some subsequent point, Avagyan commented that Basil could not charge him with a crime because there was nothing incriminating on his person. (Tr. 197:23-198:2).

## B. Procedural History

Ghazaryan, Margaryan, and Avagyan were charged with various offenses related to credit card skimming.

11

Ghazaryan and Margaryan jointly filed a Motion to Suppress and for a Franks Hearing based on their encounter with the Spotsylvania officers on April 21, 2015, alleging two grounds: (1) that the search of the Honda van and the search of Ghazaryan's person were illegal, and (2) that any evidence discovered after acquiring a warrant should be suppressed because it was the product of an illegal search of the van and the warrant failed to disclose that the warrant was based on illegally obtained evidence. (G/M Suppression Mem.). Avagyan also filed a Motion to Suppress, identical to Ghazaryan and Margaryan's. (Docket No. 39).[15] The Government filed a single Response in Opposition. (Gov't's Suppression Resp.). Ghazaryan and Margaryan jointly filed a Reply to Response. (Docket No. 45) ("G/M Suppression Reply"). Avagyan also filed a Reply to Response, this time focusing on the arrest and search of Avagyan rather than the search of the van. (Docket No. 46) ("Avagyan Suppression Reply"). [16]

---

[15] The briefs did not pursue the request for a Franks hearing, and that topic requires no further discussion.

[16] At the original hearing, defense counsel requested, and the Court granted, a continuance so that (1) defense counsel could transcribe a portion of a dashboard camera recording and (2) to allow further briefing on the search in light of the officers' testimony. (Tr. 237:25-246:9).

Ghazaryan and Margaryan jointly submitted their Supplemental Argument to Motion to Suppress (Docket No. 59) ("G/M Supp. Mem."), which was followed by the Government's Response (Docket No. 61) ("Gov't's G/M Rep.") and Ghazaryan and Margaryan's joint Reply (Docket No. 64) ("G/M Supp. Reply"). Avagyan submitted his Supplemental Brief in Support of Motion to Suppress (Docket No. 58) ("Avagyan Supp. Mem."), which was followed by the Government's Response (Docket No. 60) ("Gov't's Avagyan Supp. Resp.") and Avagyan's Rebuttal (Docket No. 63) ("Avagyan Supp. Reply"). The Government subsequently ordered Avagyan and the Government to clarify the items and statements that each party sought to suppress or introduce. (Order, Docket No. 66); the parties timely filed their supplements (Docket Nos. 67, 68). At the second round of oral argument, the Court requested supplemental briefing from Ghazaryan, Margaryan, and the Government on: (1) the type of remedy sought, and (2) whether and how Brendlin v. California, 551 U.S. 249 (2009) affected the standing of Ghazaryan and Margaryan to challenge the search of the Honda. (Order, Docket No. 72). The parties submitted their briefing accordingly. (Defendants Ghazaryan and Margaryan's Mtn. to Suppress Second Supplement, Docket No. 70; Gov't's Second Supplemental Resp., Docket No. 73; Defendants Ghazaryan and Margaryan's Reply, Docket No. 74).

13

## GHAZARYAN AND MARGARYAN: STANDING IN THE HONDA

The parties dispute two standing issues: (1) whether Ghazaryan had a legitimate and reasonable privacy interest in the Honda; and (2) whether Margaryan had a legitimate and reasonable privacy interest in the Honda. (Tr. 5:17-24; 16:11-17:5).[17] Before assessing the constitutionality of the officers' actions, the Court must assess whether Ghazaryan and Margaryan have standing to challenge certain items found in the Honda. These items, and the locations where they were found, are:

- Cards, found in the driver's door panels of the van.

- Cards, found in the sunglasses pocket on the driver's side.

- Cards, found in a white plastic bag on the floor in front of the second-row seats in the van.

---

[17] The parties do not dispute that Ghazaryan had a legitimate and reasonable privacy interest in his person (Tr. 16:11-17:5) or that Margaryan lacked a legitimate and reasonable privacy interest in Ghazaryan's person. (Tr. 16:11-17:5; Gov't's Suppression Resp. 11).

Additionally, the parties do not dispute Avagyan's (1) standing to challenge the search and seizure of his own person and (2) his lack of standing to challenge the search and seizure of Ghazaryan, Margaryan, and the Honda. (Tr. 16:11-17:5; Gov't's Suppression Resp. 10-11). See also United States v. Williams, 159 F. App'x 500, 502 (4th Cir. 2005) (person not in the car lacks standing to challenge search of items in the car).

14

- A cell phone and $1,260 cash, found in the glove compartment.

- Cash, cards, and electronics, found in the center console.

(E.g., Gov't's Suppression Resp. 7).

A person who makes a motion to suppress evidence must show that he was "a victim of a search or seizure … as distinguished form one who claims prejudice only through the evidence gathered as a consequence of a search or seizure directed at someone else." Jones v. United States, 362 U.S. 257, 261 (1960), overruled on other grounds, United States v. Salvucci, 448 U.S. 83 (1980). In other words, a person may only move to suppress to vindicate his own legitimate and reasonable interest in privacy. Rakas v. Illinois, 439 U.S. 128 (1978).

In this case, the scope of Ghazaryan and Margaryan's[18] reasonable and legitimate expectation of privacy, and hence their standing to challenge certain items found in the vehicle, depends on whether they possessed the car with permission of the owner.

---

[18] As discussed later, Margaryan's standing is actually not affected by whether or not the car was stolen, because he was merely a passenger. The non-permission issue is mostly relevant to Ghazaryan.

15

## A. The Facts Presented Indicate that Ghazaryan and Margaryan were not in the Van with the Owner's Permission

Defendants assert that a legitimate occupant-possessor with the "property rights of a bailee" has standing to challenge the search of a vehicle. (G/M Suppression Reply 2-3) (relying on Jones, 132 S. Ct. at 945 n.2). The Court is faced with a preliminary question, then, of whether Ghazaryan enjoyed the property rights of a bailee - that is, whether Ghazaryan enjoyed the owner's permission to use the vehicle.[19] The parties agreed that neither Ghazaryan nor Margaryan owned the Honda, but dispute whether Ghazaryan had permission from the owner of the Honda to use the van.

The Government presented evidence that the Honda's owners of record had no connection to Ghazaryan and Margaryan, and that no one had attempted to claim the impounded Honda. (Tr. 11:11-25:20). The Court also heard testimony from Ghazaryan, who testified that a "Russian guy" identified only as Yuraslav gave

---

[19] Under United States v. Wellons, 32 F.3d 117, 120 (4th Cir. 1994), and under the rules of most circuits, a car need not actually be stolen for a driver to lack possessory interest. Rather, if the occupants do not have the owner's permission to occupy the vehicle, then the occupants have no standing. United States v. Smith, 263 F.3d 571, 582-585 (6th Cir. 2001) (collecting circuit court cases). In the instant case, however, there is a reasonable inference that the vehicle was, in fact, stolen.

16

him the keys to the Honda and permission to drive the Honda. (Tr. 6:8-11:5). The Government produced evidence, and cross-examined Ghazaryan to establish, that Ghazaryan could not provide any more identifying information on Yuraslav, that Ghazaryan was unfamiliar with any of the names associated with title to the Honda, and that no one had made an effort to claim the impounded Honda. (Tr. 8:6-16:4; 19:19-21:14). The record also showed that the registered owner of the van was not named Yuraslav. (Tr. 11:11-25:20). Without ruling on the standing issue at that time,[20] the Court stated that it found Ghazaryan's testimony incredible in light of Ghazaryan's inability to provide identifying information for Yuraslav or to explain Yuraslav's lack of connection to the title holders of record. (Tr. 25:21-27:7) ("I can't credit Mr. Ghazaryan's testimony that he received keys from the owner or the permission of the owner. I don't believe him."). In sum, the Court found at the hearing, and reaffirms now, that Ghazaryan's testimony is simply not credible.

---

[20] Ghazaryan and Margaryan's first supplemental brief operated under the assumption that the Court had already ruled on the baileeship issue. This was understandable, because the Court clearly telegraphed that it did not believe Ghazaryan, but not an entirely accurate reflection of the record. At the first hearing, the Court stated that it had "decided the question of permission" (Tr. 28:13-14), but did not take the next step decide the issue of standing.

The Government has the initial burden to produce evidence tending to show that a vehicle was stolen or was otherwise possessed without the owner's permission. United States v. Rusher, 966 F.2d 868, 874 (4th Cir. 1992). Once the government has produced that evidence, the burden is on a defendant to show that he acquired the vehicle legitimately, i.e., that he possessed it with the owner's permission. United States v. Hargrove, 647 F.2d 411, 412 (4th Cir. 1981); United States v. Dickerson 655 F.2d 559, 561 (4th Cir. 1981).[21]

In this case, the Government has produced evidence that, if unrebutted, shows that Ghazaryan and Margaryan did not have permission from the owners to be in the van. The Court, having heard Ghazaryan's testimony, has found that testimony to lack credibility. Thus, the only credible evidence comes from the Government. Considering the Government's credible evidence, together with the inference that is drawn from Ghazaryan's untruthful testimony, the Government has met its burden. The Court finds that neither Ghazaryan nor Margaryan had permission from the Honda's owner to occupy the Honda van.[22]

---

[21] Hargrove is in line with the general rule that the person who makes a motion to suppress must show that his legitimate interests were violated. E.g., Jones, 362 U.S. at 261 (1960).

[22] Even if the burden lay on the Government to prove Ghazaryan and Margaryan's lack of permission by a preponderance of the

## B. Occupants of a Stolen Vehicle have Limited Standing to Challenge the Search of a Vehicle

Having ascertained the status of Ghazaryan and Margaryan with regard to the Honda, the Court considers the outer bounds of defendants' reasonable and legitimate privacy interests in the vehicle which they lacked permission to occupy.

According to the Fourth Circuit and the Supreme Court, a person present in a stolen automobile at the time of the search may not object to the lawfulness of the search of the automobile. Rakas, 439 U.S. at 141 n.9; see also United States v. Wellons, 32 F.3d 117, 120 (4th Cir. 1994); Hargrove, 647 F.2d at 412; United States v. Thomas, 128 F. App'x 986 (4th Cir. 2005).

However, in Rakas, Wellon, and Hargrove, the Supreme Court and the Fourth Circuit have acknowledged that non-owners have a right to challenge the legality of their own detention, stemming from their own interest in not being stopped (rather than any interest in the vehicle). Rakas, 439 U.S. at 128; Wellons, 32 F.3d at 120; Hargrove, 647 F.2d at 412.

Additionally, the Supreme Court held that, when a car is stopped, all passengers are stopped, and have standing to

evidence, the Government's proof combined with Defendants' lack of proof would satisfy that higher standard, as well.

challenge the constitutionality of their stop. Brendlin v. California, 551 U.S. 249, 251 (2007). In Brendlin, a passenger-defendant challenged both the evidence found on his person and the evidence found in the car as fruits of an unconstitutional seizure. Brendlin, 551 U.S. at 252. The passenger-defendant "did not assert that his Fourth Amendment rights were violated by the search of [owner-driver's] vehicle, but claimed only that the traffic stop was an unlawful seizure of his person." Brendlin, 551 U.S. at 252. The Court did not decide whether the passenger-defendant had standing to challenge the evidence. Instead, it only held that the passenger-defendant was seized at the time of the stop.

The Government, in its second supplemental brief in this case, cited several appellate court decisions holding that Brendlin's scope was quite limited, and that Brendlin does not undermine Rakas or confer an expectation of privacy in a stopped vehicle on a passenger in that vehicle. (Gov't's G/M Second Supp. 2 n.1) (gathering circuit court decisions); see also United States v. Monroe, 396 Fed. App'x 33, 37 (4th Cir. 2010) ("While Tyler had the right to challenge the traffic stop, see Brendlin ... he had no right under the Fourth Amendment to challenge the ensuing search of the vehicle because he lacked a

legitimate expectation of privacy with respect to the vehicle that belonged to its driver").[23]

Because Brendlin did not revolutionize the field of non-owner, non-driver standing, the Court may safely look to older decisions on non-owner, non-driver standing to determine the scope of a non-owner, non-driver's standing. In the context of passengers,

> [a] passenger in a vehicle that is stopped ordinarily lacks standing to challenge a search of the vehicle, but he does have standing to challenge the legality of his own detention and, if the detention is illegal, to seek suppression of items found during the vehicle search. See United States v. Carter, 300 F.3d 415, 421 (4th Cir.2002) ("A passenger in a car normally has no legitimate expectation of privacy in an automobile in which he asserts neither a property interest nor a possessory interest and where he disclaims any interest in the seized object"); United States v. Rusher, 966 F.2d 868, 874 n.4 (4th Cir. 1992) ("Even though the Rushers cannot challenge the search of the truck, they can challenge their own seizures.... This means that they have standing to argue that the initial stop of the truck [was] ... illegal").

United States v. Mayes, 103 F. App'x 495, 499 (4th Cir. 2004) cert. granted, judgment vacated on other grounds, 543 U.S. 1111 (2005) and adhered to on reconsideration, 178 F. App'x 331 (4th Cir. 2006).

---

[23] Unpublished opinions of the Fourth Circuit are not binding, but they enjoy persuasive effect and are useful analytical tools.

In summary: <u>Brendlin</u> stands for the proposition that a person in a vehicle is always stopped when the vehicle in which he is travelling is stopped. <u>Mayes</u> stands for the proposition that being stopped gives the passenger standing to challenge the stop of his own person and, as in <u>Rakas</u>, any items in the car in which he might have a legitimate and legitimate expectation of privacy; <u>see also</u> <u>Rusher</u>, 966 F.2d at 875 (noting that husband has no interest in privacy in his wife's purse). <u>Brendlin</u> and <u>Mayes</u> have not supplanted the older rules of <u>Rakas</u>, <u>Wellon</u>, <u>Carter</u>, and <u>Hargrove</u>. Rather, taken together, they teach that a non-owner in a stolen vehicle may challenge: (1) the stop of the car; and (2) any resulting search of his person; but not (3) a search of the car. As the Fourth Circuit recently noted in an unpublished opinion:

> Mohammed challenges both the stop of the vehicle and its subsequent search as violative of the Fourth Amendment. As a passenger in a stolen vehicle, Mohammed lacks standing to challenge the search of the vehicle. <u>United States v. Carter</u>, 300 F.3d 415, 421 (4th Cir. 2002); <u>United States v. Hargrove</u>, 647 F.2d 411, 412 (4th Cir. 1981). Thus, we decline to review Mohammed's challenges to the validity of the canine alert that precipitated the vehicle search. However, Mohammed <u>does have standing to challenge</u> the stop and his resulting seizure. <u>United States v. Rusher</u>, 966 F.2d 868, 874 (4th Cir. 1992).

United States v. Mohammed, 572 F. App'x 203, 204 (4th Cir. 2014) (emphasis added).[24] Moreover, although Mohammed dealt with a passenger in a stolen vehicle, at least two district courts in this circuit have – even after Brendlin and Mayes – held that drivers of a stolen vehicle do not have standing to challenge the search of a stolen car or suppress items found during the search of that stolen car. United States v. Davis, No. CRIM. DKC 11-0171, 2011 WL 6369253, at *6 (D. Md. Dec. 19, 2011) ("The Fourth Circuit has held that a defendant does not have a reasonable expectation of privacy in a stolen vehicle, and therefore lacks standing to object to a search of the vehicle"; relying on Hargrove); Jackson v. Eagleton, No. CA 6:08-599-TLW-WMC, 2009 WL 799650, at *10 (D.S.C. Mar. 23, 2009) ("[t]he petitioner had no standing to challengee the search and seizure of the video tape because he had no reasonable expectation of privacy in the stolen vehicle") (relying on Wellons and Hargrove).

---

[24] Mohammed does not clarify whether defendant-passenger sought to suppress evidence found on his person or if defendant-passenger sought to suppress evidence found in his car, because the court found that the stop was legal. Mohammed, 576 F. App'x at 206.

Mohammad also establishes that passengers in a stolen vehicle are subject to the same restrictions on standing as drivers in a stolen vehicle. Id. at 204.

Considering all of the cases referenced above, the best synthesis of current case law is that: any occupant of a stopped car is stopped himself (<u>Brendlin</u>) such that he has standing to challenge both (1) the legality of the stop (<u>Mayes</u>) and (2) the search/seizure of his person (<u>Mayes</u>, <u>Mohammed</u>); however, an occupant of a stolen vehicle lacks standing to challenge the search of the car. (<u>Rakas</u>, <u>Wellon</u>, <u>Carter</u>, <u>Hargrove</u>).

## C. Occupants of a Stolen Vehicle Lack Standing to Challenge the Search or Seizure of Most Areas of that Vehicle

This synthesized rule is largely dependent on <u>Brendlin</u> and <u>Rakas</u>, which both rooted a passenger's standing to challenge the stop of a car in that passenger's interest in his <u>person</u> rather than the passenger's (non-existent) possessory interest in the car. Because the rights of an "occupant of a stolen car" and an "passenger of a legitimately occupied car" both stem from the same source of rights, this Court looks to cases dealing with passengers to determine the outer bounds of the standing enjoyed by unlawful occupants of a vehicle.[25]

<u>Rakas</u> holds that a non-owner passenger who enjoys the owner's permission to use the car has standing to challenge a

---

[25] Even if the car were not stolen, Margaryan – as a mere passenger – would enjoy the same limited rights to which Ghazaryan and Margaryan are entitled as unauthorized occupants of a stolen car.

search of the particular areas of the automobile in which he has a legitimate and reasonable expectation of privacy. Non-owner passengers who have the owner's permission to be in the vehicle enjoy standing only as to items over which they have control; passengers, therefore, have no interest in the space under the driver's seat, in the trunk, or in a locked glovebox to which only the owner has a key. Rakas, 439 U.S. at 148.

Rakas gave examples of places that a passenger (and hence, the occupant of a stolen vehicle) does not have standing; however, case law is actually quite sparse on where a passengers or occupants of a stolen vehicle do have standing. In other decisions, the Fourth Circuit and district courts within the circuit have held that passengers do not enjoy an interest in:

- Items underneath the passenger's seat, United States v. Lusk, 100 F. App'x 938, 940 (4th Cir. 2004) on reh'g, 142 F. App'x 680 (4th Cir. 2005); accord United States v. Pulliam, 405 F.3d 782, 786 (9th Cir. 2005); United States v. Symonevich, 688 F.3d 12, 21 (1st Cir. 2012). Cf. United States v. Mosley, 743 F.3d 1317, 1322 (10th Cir.) cert. denied, 135 S. Ct. 184, 190 L. Ed. 2d 143 (2014) (holding that passenger had standing to challenge gun found under seat, when finding of that gun could be

25

characterized as a fruit of the illegal stop of his own person);

- Items found in the driver's lap, <u>United States v. Flowers</u>, 173 F. App'x 240, 242 (4th Cir. 2006);

- Items found in the passenger side glove compartment, <u>United States v. Batista</u>, No. 5:12CR11, 2013 WL 782710, at *1 (W.D. Va. Feb. 28, 2013).

Another circuit court has similarly held that, when no authorized driver is present, the occupants of a car have no interest in bags in the back rows of a vehicle. <u>United States v. Worthon</u>, 520 F.3d 1173, 1183 (10th Cir. 2008); <u>see also</u> <u>United States v. Barragan</u>, 379 F.3d 524, 527 (8th Cir. 2004) (noting lack of standing in secret compartment in back of van).

## D. Conclusion

Because passengers do not even enjoy an interest in items under their own seats, it is reasonable to say that unauthorized occupants of a car similarly have an extremely limited interest, and extremely limited standing, when challenging any items not actually on their persons.

Under the authorities cited above, Margaryan clearly has no interest in: (1) the cards found in the driver's door panel; (2) the cards found in the sunglasses pocket on the driver's side; (3) the cards found in the white plastic bag in the second row;

26

and (4) the cell phone and $1,260 cash found in the glove compartment. Given precedent that a passenger has no interest in items found under his own seat, Margaryan also lacks a reasonable expectation of privacy in the cash, cards, and electronics found in the center console. The center console, even more so than the space under the passenger seat, is an area typically controlled by the owner.

Under the authorities cited above, Ghazaryan unquestionably has no interest in: (1) the cards found in the white plastic bag in the second row; (2) the cellphone and $1,260 cash found in the glove compartment; and (3) the cash, cards, and electronics found in the center console. Conceptually, Ghazaryan might have a reasonable expectation of privacy, and hence standing, in: (1) the cards found in the driver's door panel; and (2) the cards found in the sunglasses pocket on the driver's side, because these are more accessible to a driver than the space beneath a passenger seat is to a passenger. However, the record here does not establish any such expectation. The Court declines to wade extensively into the factual issue of whether the limited interests of a driver of a stolen vehicle extends to the driver's door panel and the sunglasses pocket, because, as discussed later, there was no constitutional violation as to Ghazaryan.

27

**GHAZARYAN AND MARGARYAN: STOPS, SEIZURES, AND SEARCHES**

Police are free to approach civilians and question them; however, searching or seizing a civilian requires a warrant unless a recognized warrant exception applies. E.g., United States v. Stover, 808 F.3d 991, 995-96 (4th Cir. 2015) (noting that the "right of the people to be secure in their persons" against unreasonable seizures "does not extend to all police-citizen encounters") (relying on Jones, 678 F.3d at 298-99).

This section addresses the progression of the investigation conducted by the deputies, and how relevant exceptions to the warrant requirement justified the deputies' actions at each stage. The relevant exceptions are: (1) Terry stops and frisks (and the point at which a stop or frisk becomes a seizure or stop); (2) plain view; (3) search incident to arrest; (4) the automobile exception; and (5) inevitable discovery in conjunction with the inventory search exception.

**A.   The Stop of Ghazaryan and Margaryan Satisfied the Requirements of Terry v. Ohio**

**1. Applicable legal standards**

**a. Terry stops require reasonable suspicion**

An officer does not need a warrant or probable cause to briefly detain a civilian; instead, an officer may briefly

28

detain a civilian when he has reasonable, articulable, personalized suspicion that the person is or has been engaged in illicit activity. United States v. Smith, 994 F. Supp. 2d 758, 761-62 (E.D. Va. 2013) aff'd, 583 F. App'x 196 (4th Cir. 2014) (relying on Terry v. Ohio, 392 U.S. 1, 21 (1968)).

> [T]he government "'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" United States v. McBride, 676 F.3d 385, 391 (4th Cir. 2012) (quoting Terry, 392 U.S. at 21, 88 S.Ct. 1868). This suspicion must be based on more than an officer's hunch, but reasonable suspicion is less than probable cause. United States v. Arvizu, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002); Terry, 392 U.S. at 27, 88 S.Ct. 1868. And, because the intrusion created by an investigatory stop is minimal, the reasonable suspicion standard is set fairly low. See United States v. Glover, 662 F.3d 694, 698-700 (4th Cir. 2011) ....
>
> Determining whether there was reasonable suspicion to detain a suspect must be made by considering "the totality of the circumstances." Arvizu, 534 U.S. at 273, 122 S.Ct. 744. The determination requires a flexibility that "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Id. (quoting United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). We "consider [these inferences] in their totality, not piecemeal and in isolation." United States v. Darden, 149 F.3d 1171, 1998 WL 340400, at *5, 1998 U.S. Dist. LEXIS 12728, at *15 (4th Cir. June 16, 1998)

(unpublished opinion). We must " 'give due weight to inferences drawn from those [circumstances] by ... local law enforcement officers.' " Id. (quoting Ornelas v. United States, 517 U.S. 690, 699-700, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).

Id. at 761-62. In other words, a Terry stop is justified when:

the officer "[is] able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Terry, 392 U.S. at 21, 88 S.Ct. 1868. The officer must have "reasonable and articulable suspicion that the person seized is engaged in criminal activity." ... "The level of suspicion must be a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" ... That is, the officer must have more than an "inchoate and unparticularized suspicion or 'hunch.'" ...

We look to the totality of the circumstances in determining whether the officer had reasonable suspicion of criminal activity .... "[I]ndividual facts and observations cannot be evaluated in isolation from each other[]" ...; factors "susceptible to innocent explanation" individually may "suffice[] to form a particularized and objective basis" when taken together[].

United States v. Slocumb, 804 F.3d 677, 681-82 (4th Cir. 2015) (internal citations omitted).

"Courts have considered the following circumstances relevant to determining whether officers had a reasonable suspicion to detain a suspect: (1) presence in a high crime area; (2) evasive conduct; (3) furtive behavior; and (4)

observation by law enforcement of what appears to be criminal activity." Smith, 994 F. Supp. 2d at 761-62 (internal citations omitted). Canvassing behavior, Terry, 392 U.S. at 1, nervousness, Illinois v. Wardlow, 528 U.S. 119 (2000), and refusal to cooperate, Florida v. Bostick, 501 U.S. 429, 437 (1991) also all contribute to reasonable suspicion when combined with other factors.

### b. Defendants are "stopped" when they would not feel free to leave

Not all interactions with police rise to the level of a Terry stop. One way to demonstrate that a defendant is "stopped" is to show that defendant would not feel free to leave or would not feel free to disregard the police and go about his business. E.g., Stover, 808 F.3d at 995.

Some factors that indicate a reasonable person would not feel free to disregard the police and go about his business include: (1) the defendant's un-coerced consent; (2) the location of the interaction; (3) how closed off or isolated the defendant and officer are at the time of the stop; (4) whether the officer brandished a weapon; (5) whether the officer used threats or commands or an authoritative tone of voice; (6) whether the officer used intimidating movements; (7) whether the officer used force; and (8) whether the interaction took place

31

in a public location. United States v. Drayton, 536 U.S. 194 (2002); Bostick, 501 U.S. 429. Failure to inform a defendant of his right to refuse does not make an interaction a stop. Drayton, 536 U.S. at 194. A person in a car whose license has been taken by an officer is stopped. Rusher, 966 F.2d at 876 (4th Cir. 1992) ("in defining an officer's proper investigative scope for a routine traffic stop [the] officer: may request a driver's license and vehicle registration").[26]

### c. Conduct observed and conveyed by a reliable informant may provide the basis for stopping a defendant

Florida v. J.L., 529 U.S. 266 (2000), restricts the weight that may be placed on tips of anonymous informants, but does not restrict the weight that may be given to tips by reliable informants - so long as the informant is, in fact, reliable.

> If an informant's tip is relied upon as part of the justification for a Terry stop, the tip must possess "sufficient indicia of reliability." [ United States v. Perkins, 363 F.3d 317, 323 (4th Cir. 2004) ]. The reliability assessment tests the veracity of the informant and the basis of his knowledge, and, consequently, whether his information is credible enough to provide the basis for the reasonable suspicion required to conduct a Terry stop. See

---

[26] Defendants claim that Ghazaryan and Margaryan were "seized" when Hanrahan took their driver's licenses. (G/M Suppression Reply 3). Defendants are incorrect. They were merely stopped.

> Alabama v. White, 496 U.S. 325, 328-39, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); J.L., 529 U.S. at 272, 120 S.Ct. 1375.
>
> In discussing "the reliability needed for a tip to justify a Terry stop," the Supreme Court also has held that "[t]he reasonable suspicion here at issue requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." J.L., 529 U.S. at 272, 120 S.Ct. 1375. The Court explained that "[a]n accurate description of a subject's readily observable location and appearance is of course reliable" in the sense that "it will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity." Id.

United States v. Morton, 400 F. Supp. 2d 871, 875-76 (E.D. Va. 2005).

Factors which contribute to an informant's designation as "reliable" include: (1) an informant's track record of providing tips that resulted in arrests and convictions, (2) officers knowing the identity of the informant, such that the informant would be subject to criminal prosecution if he lied to law enforcement, (3) direct observation of criminal activity by the informant, (4) a short period of time between the observation of criminal activity and the informant's report to law enforcement, and (5) informant's provision of a detailed description of a suspect which is verified once officers reach the scene. Morton,

400 F. Supp. 2d at 875-76 (cataloguing Supreme Court and Fourth Circuit cases).

### d. Deputies are entitled to rely on the characterizations of dispatchers

Ghazaryan and Margaryan particularly point out that evidence produced in discovery, though not in the hearing, reveals that an unknown individual called the Wells Fargo Bank security office, and that the Wells Fargo Bank security staff relayed the unknown individual's information to the Spotsylvania dispatcher. (G/M Supp. Reply 3 n.1) (relying on Bates No. 4276). Thus, although the deputies believed (and testified) that the report about three Middle Eastern men cycling between banks came from the Wells Fargo Bank security staff (Tr. 36:6-25; 153:10-24),[27] the reports, according to the Defendants, appear to ultimately have come from an unknown source. Defendants state that the deputies did not take "measures … to establish the reliability, or the facts of the report," and argue that officers must take "measures to justify the reliability of [a] tip" before relying on that tip. (G/M Supp. Reply 8-9). Defendants assert that the distinction between the information originating with a unknown source or a Wells Fargo Bank security

---

[27] As is confirmed by Defendants' own brief, the deputies also discussed their belief that the information came from Wells Fargo Bank security staff. (G/M Supp. Reply 4).

officer is relevant because anonymous tips from unknown sources identifying a person without evidence of criminal behavior does not provide reasonable suspicion. (G/M Supp. Reply 8) (relying on Florida v. J.L., 529 U.S. at 266).

Decisional law teaches, however, (1) that officers are entitled to rely on information communicated by dispatchers in assessing reasonable suspicion and (2) that the exclusionary rule does not apply to officers' reasonable mistakes.

In Bibart v. Stachowiak, 888 F. Supp. 864, 867 (N.D. Ill. 1995), the court held that an officer is entitled to rely on a dispatcher's representations in the context of qualified immunity. Additionally, officers in one jurisdiction are also entitled to rely on the determination of another jurisdiction that there is reasonable suspicion to stop a person. United States v. Hensley, 469 U.S. 221, 232 (1985). As the Supreme Court noted, "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." Id. at 231; see also Wilson v. Kittoe, 229 F. Supp. 2d 520, 537-38 (W.D. Va. 2002) (finding that a reasonable officer who arrives on the scene would defer to another

35

officer's explanation of what transpired before his or her arrival) (cited approvingly by Guerrero v. Deane, 750 F. Supp. 2d 631, 652 (E.D. Va. 2010)). The cases teach that it was reasonable for the deputies to have relied on the dispatcher's statement that the information came from a Wells Fargo Bank security officer without cross-examining the dispatcher on the foundation for the information the dispatcher provided.

Moreover, an officer's mistaken beliefs are typically irrelevant during a motion to suppress, so long as the mistaken belief is reasonable. E.g., Maryland v. Garrison, 480 U.S. 79, 87-88 (1987); Hill v. California, 401 U.S. 797 (1971); Illinois v. Rodriguez, 497 U.S. 177 (1990). Because it was reasonable for the deputies to rely on the dispatcher's characterization, as discussed immediately above, the fact that the dispatcher may ultimately have been mistaken does not affect the weight that the deputies were entitled to give the information relayed to them in the dispatch call. In other words, when the deputies examined the totality of the circumstances, they were justified in their reasonable-but-mistaken belief that the report of suspicious activity came directly from a Wells Fargo Bank security officer. As this Court has previously noted, it is the information known to the officer (or in this case, reasonably believed by the officer) that matters to the reasonable

36

suspicion calculation. Smith, 994 F. Supp. 2d at 761-62 ("We must "'give due weight to inferences drawn from those [circumstances] by ... local law enforcement officers.'").

Weaving these strands of decisional law together, it is clear that because the officers could reasonably rely on dispatch's characterization of the source of the information, they were entitled to treat the information as coming from a reliable and non-anonymous source when making the reasonable suspicion calculation.

This is all consonant with the purpose of the exclusionary rule generally: deterring unlawful government behavior by removing the incentive to disregard the Fourth Amendment. E.g., Michigan v. Tucker, 417 U.S. 433, 447 (1974). That deterrence rationale is not served by applying the exclusionary rule where officers act in good faith and with reasonable diligence, because the "deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct." Id. The officers here were not willful or negligent in their mistaken belief that the description of suspicion activity came from a Wells Fargo Bank security officer. Therefore, the deterrent purposes of the exclusionary rule would not be furthered by punishing the officers for their good faith and reasonably diligent efforts.

37

## 2. Application to facts

Ghazaryan and Margaryan were stopped when Hanrahan took their driver's licenses to "run their information." (G/M Supp. Mem. 16-19; G/M Supp. Reply 6-7) (relying on United States v. Weaver, 282 F.3d 202, 311 (4th Cir. 2002)); see also Rusher, 966 F.2d at 876). As such, the initial question is whether Hanrahan had reasonable, articulable, particularized suspicion that Ghazaryan and Margaryan were engaged in illicit activity when he took their licenses and returned to his squad car.

The Government and Defendants agree that there were several facts known to Hanrahan at the time of the stop that were relevant to the reasonable suspicion calculation:

(1)     The dispatcher had reported that a Wells Fargo Bank security officer had reported that three Middle Eastern males were rotating to and from Wells Fargo's ATM, PNC Bank's ATM, and a Honda with certain plates.

(2)     The deputies knew that credit card skimmers had been active in the area, and rotation between ATMs was consistent with the manner in which credit card skimmers were known to operate.

(3)     The Honda stopped by Hanrahan had the plates conveyed by the dispatcher and was in the location conveyed by the dispatcher, in a parking lot near the banks described in the report.

(4)     Ghazaryan and Margaryan denied that they were accompanied by a third person, contrary to the dispatcher's report.

(5)     Ghazaryan and Margaryan denied that they had been at any banks.

38

(6)     Ghazaryan and Margaryan produced New York drivers' licenses.

(7)     Ghazaryan and Margaryan were off the beaten path (e.g., off I-95) for travelers from the Northeast or for persons seeking to purchase used vehicles.

(8)     Ghazaryan provided, unsolicited, a PBA card at the time he offered his driver's license.

(Gov't's G/M Supp. Resp. 19-20; G/M Supp. Reply 10-14). Slocumb mandates that, in assessing reasonable suspicion, the Court must look to the totality of the circumstances, rather than considering individual facts in isolation. Slocumb, 804 F.3d at 681-82 ("factors susceptible to innocent explanation individually may suffice to form a particularized and objective basis" when taken together.") (internal quotations omitted); see also United States v. Sokolow, 490 U.S. 1, 9-10 (1989) ("Indeed, Terry itself involved 'a series of acts, each of them perhaps innocent' if viewed separately, 'but which taken together warranted further investigation.'") (internal citations omitted).

Defendants are correct that several of these facts are innocuous in isolation, particularly the fourth, fifth, sixth, and seventh facts. Viewed in isolation, there is nothing suspicious about two people travelling together and denying the existence of a third companion, about two people denying any recent trips to banks, about two people with licenses from State

39

A travelling through State B in a car with places from State C, or two people travelling away from I-95.

Viewing all of the facts together, however, provides the reasonable, articulable, particularized suspicion necessary to initiate a Terry stop.

First, the Wells Fargo Bank call provided information that three Middle Eastern males were rotating to and from a Honda, with specified license plates and a specific description, and the ATMs of two different banks. Based on the dispatcher's characterization, the deputies believed that the tip came from Wells Fargo security (rather than an anonymous source), and the deputies knew that the dispatchers had provided a detailed description of the suspects, the vehicle, and the location of the suspicious activity. When Hanrahan arrived at the specified location, he found the specified vehicle with the specified license plates, as well as two people matching the description given by the dispatcher. The detailed, verified description gave the tip a level of reliability that entitled Hanrahan to rely upon that tip when assessing the existence of reasonable, articulable, particularized suspicion. See, e.g., Morton, 400 F. Supp. 2d at 875-76. And, from what Hanrahan knew,[28] the tip was

---

[28] As noted earlier, even though the information about the source of the tip was ultimately incorrect, it was reasonable for the

provided by a reliable source: a bank security officer observing activity relevant to bank security.

Second, Hanrahan's knowledge that credit card skimmers were active in the area, and that rotating between ATMs was unusual activity, provided reasonable and articulable suspicion that the conduct identified might well be criminal activity. That knowledge warranted further inquiry.

Third, the Wells Fargo Bank call's description of the physical characteristics, plates, and location of the Honda, coupled with Hanrahan encountering a Honda with those physical characteristics, plates, and location, provided particularized suspicion that the occupants of the Honda were the particular Middle Eastern males who had previously been observed rotating between the ATMs. These first three facts together were adequate for reasonable, articulable, particularized suspicion that these men might well be engaged in criminal activity.

Defendants point to Florida v. J.L. for the proposition that an anonymous informant providing a physical description of a person and alleging that the person possessed a firearm was not sufficient to provide reasonable suspicion. Florida v. J.L., 529 U.S. at 270. The facts of this case, however, are different

---

deputies to rely on the dispatcher's characterization of the source.

from those in J.L. Here, the deputies reasonably believed that the information came from a reliable source - a Wells Fargo Bank security officer - rather than from an anonymous informant. Tips from reliable informants, unlike uncorroborated anonymous informants, may be considered in making a reasonable suspicion determination. Morton, 400 F. Supp. 2d at 875-76; see also United States v. Glover, 662 F.3d 694, 698-700 (4th Cir. 2011) (noting that reasonable suspicion is a fairly low standard). Any contrary finding would run counter to the purpose of Terry stops, which is to allow an officer to confirm or dispel his suspicions of criminal activity. See, e.g., United States v. Sharpe, 470 U.S. 675, 686 (1985) ("In assessing whether a detention is too long in duration [courts consider] whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions."). Given that Hanrahan received a report that a Wells Fargo security officer had observed these particular men engaged in the unusual behavior of repeatedly going between a vehicle and the ATMs of different banks (the officers characterized this behavior as "cycling"), that credit card skimmers unlawfully took money from ATMs, and that there had been credit card skimming in the area, Hanrahan was entitled to perform an investigative stop to

42

confirm or dispel his suspicions that Ghazaryan and Margaryan were engaged in unlawful activities.[29]

Considering all of the circumstances, Hanrahan had reasonable suspicion of criminal activity and was entitled to proceed with the investigative stop.

**B. The Terry stop did not become a seizure or search prior to establishment of probable cause**

   **1. Applicable legal standards**

      **a. A Terry stop becomes a seizure when it continues too long**

A stop becomes a seizure when it goes too far in scope. Duration, moving a suspect, and intrusiveness indicate that a stop has become an arrest. Sharpe, 470 U.S. at 675; Florida v. Royer, 460 U.S. 491 (1983); Dunaway v. New York, 442 U.S. 200, 212 (1979).

"In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel

---

[29] Ghazaryan and Margaryan's denials, in light of the Wells Fargo call and Hanrahan locating the van and men in question, are not necessary to meet the minimal standards of reasonable suspicion. However, in light of the contradictory Wells Fargo report, these denials were suspicious.

their suspicions quickly." Sharpe, 470 U.S. at 686; see also United States v. Elston, 479 F.3d 314, 319-20 (4th Cir. 2007). There is no hard and fast rule for how long a stop may last. Sharpe, 470 U.S. at 694 ("officials in one community may act with due diligence in holding an individual at an airport for 35 minutes while waiting for the sole narcotics detection dog they possess, while officials who have several dogs readily available may be dilatory in prolonging an airport stop to even 10 minutes"); see also Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015) ("Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission' — to address the traffic violation that warranted the stop … and attend to related safety concerns.") (internal citations omitted).

> **b. When a vehicle with tinted windows is lawfully stopped, the officer may open a door to see inside the vehicle**

During an otherwise constitutional Terry stop, officers may take appropriate steps to protect their safety. Hensley, 469 U.S. at 235; see also Rodriguez, 135 S. Ct. at 1614. Officers are entitled to open the doors of vehicles with tinted windows during legitimate stops without exceeding the scope of a stop. United States v. Stanfield, 109 F.3d 976, 981-82 (4th Cir.

44

1997). Stanfield says that officers who are performing a legal stop of a car with tinted windows may engage in a "reasonable protective search" for the "limited purpose of determining whether [a motorist is] armed and whether there [are] any other occupants within the vehicle who might pose a danger to him." Stanfield, 109 F.3d at 989.

### 2. Application to facts

Hanrahan's uncontroverted testimony establishes that ten or fifteen minutes elapsed between the time that he took the drivers' licenses from Ghazaryan and Margaryan and the time that Davies approached him with the plastic bag that Davies had removed from the van. (Tr. 62:4-16; 98:20-101:6). During that short time, Hanrahan was working diligently to confirm or deny his suspicions of criminal activity by calling the New York City Police Department. (Tr. 62:4-16; 98:20-101:6). The Fourth Circuit has explicitly recognized that, during a routine traffic stop, an officer may request a driver's license and vehicle registration and run a computer check for outstanding warrants. Rusher, 966 F.2d at 876-77;[30] see also Klaucke v. Daly, 595 F.3d

---

[30] Rusher actually deals with the scope of a "routine traffic stop" for a traffic violation, but references the bounds of Terry, such that it is instructive even in this case of a non-traffic Terry stop. Additionally, Rusher notes that "'When the driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on

20, 26 (1st Cir. 2010) (noting that "most circuits have held that an officer does not impermissibly expand the scope of a Terry stop by performing a background and warrant check, even where that search is unrelated to the circumstances that initially drew the officer's attention."). Hanrahan acted within the scope of a Terry stop in searching for outstanding warrants against these New York City residents with the New York City Police Department. The fact that it took Hanrahan between ten to fifteen minutes does not exceed the bounds of a Terry stop, because Terry is cognizant of the fact that resource limitations may mean that sometimes it is not possible to confirm or dispel suspicion immediately. See, e.g., Sharpe, 470 U.S. at 694. What matters is Hanrahan's diligence in working to confirm or dispel his reasonable suspicion, Sharpe, 470 U.S. at 686; Elston, 479 F.3d at 319-20, and there is no indication in the record that Hanrahan was dragging his feet at any point during his search. The time that Hanrahan spent in contact with the New York City

---

his way, without being subject to further delay by police for additional questioning.' United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir. 1988) (citations omitted). Any further detention for questioning is beyond the scope of the Terry stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime." Rusher, 966 F.2d at 876-77. In this case, Hanrahan had reasonable suspicion of a serious crime (credit card skimming), which would permit an extension of time even beyond the brief check explicitly permitted in Rusher.

Police Department is thus appropriately characterized as part of a Terry stop, rather than converting that stop into a seizure.

During the stop that was in progress here, Davies was entitled to open the door of the heavily tinted Honda. As noted, Hanrahan and Davies had reasonable suspicion that three men – Ghazaryan and Margaryan among them – were conducting criminal activity out of this particular van. Given the reasonable suspicion that a third person was involved and the fact that the deputies could not see into the back of the car, Davies was entitled to open the door as part of a reasonable protective search for the limited purpose of determining whether the Honda contained any other occupants who might pose a danger to him and Hanrahan. Stanfield, 109 F.3d at 989; see also Rodriguez, 135 S. Ct. at 1614; Hensley, 469 U.S. at 235. Because Davies was entitled to open the door, the much-discussed question of whether Margaryan opened the door or Davies inadvertently pushed a button that opened the door is of no consequence.

Defendants attempt to distinguish this case from Stanfield on the basis that: the Stanfield stop took place in a "high crime area of Baltimore known for its open narcotics trafficking"; patrolling the Baltimore location was dangerous, as evinced by the officers wearing bullet proof vests and carrying firearms; the driver of the vehicle was speaking out

47

the window with a known drug dealer; and the passenger window was up. (G/M Supp. Reply 16). By contrast, Defendants emphasize that in this case: the interaction took place in a daylit shopping center; "both occupants" were readily viewable; and the deputies could see the front row. (G/M Supp. Reply 16-17).

In making this distinction, Defendants overlook that the deputies testified that they could not see into the back of the van, where a potentially dangerous third person might be located. Even accepting Defendants' suggestion that Spotsylvania is generally less threatening than Baltimore, the deputies had reason to believe that a third person was in the van, a potentially dangerous circumstance not at play in Stanfield. Accordingly, the rationale undergirding Stanfield - that officers are entitled to open a door to ensure a plain view of the interior of a tinted vehicle to ensure that there are no weapons or persons in the unseen portions of the vehicle - is also applicable in this case. In light of the Wells Fargo Bank call, it was reasonable for Davies to suspect that a third person was present in the vehicle; therefore, under Stanfield, it was reasonable for Davies to open the vehicle door to check for the presence of a third person to assure officer safety.

48

**C. Davies's seizure of the open bag was constitutional under the plain view doctrine; seizure of the open bag provided probable cause of criminal activity**

**1. Statement of law**

When a police officer is in a place where he is lawfully permitted to be, he may seize evidence in plain view without a warrant. *Arizona v. Hicks*, 480 U.S. 321, 326 (1987). Also pertinent here is the rule that "[p]robable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (internal citation omitted).

**2. Application to facts**

Because the vehicle was stolen and because the initial stop was valid, neither Ghazaryan nor Margaryan has standing to challenge seizure of the plastic bag.[31] Nevertheless, even if

---

[31] Defendants briefly argue that Davies had some obligation to determine whether the bag belonged to one of the defendants. (G/M Supp. Br. 24-25; G/M Supp. Reply 18-19), but present no authority for the proposition that ownership is relevant to seizure of effects. In fact, Defendant's proposition runs directly contrary to *Rusher*, which stated that an item's location within a defendant's legitimate and reasonable expectation of privacy – not ownership – is the dispositive

defendants had standing, Davies' seizure of the bag was constitutional.

As discussed above, Hanrahan was justified in initiating the stop, and Davies was justified in opening the tinted van's door during the stop. Once the van door was open, it is Davies' uncontroverted testimony that Davies – without further action or manipulation of the interior of the van – saw an open plastic bag, and that through the opening in the bag he could see gray plastic cards, cut-up gray plastic cards, and receipts. (Tr. 135:1-6; 162:12-165:3).[32] Moreover, defense counsel's attempt to demonstrate that it is impossible to see through a plastic bag (Tr. 227-12:231:19; G/M Supp. Mem. 25-26) is irrelevant in light of Davies' testimony that the bag was open, and that he could see into – not through – the bag.

Once Davies saw the contents of the bag, and in light of Davies' knowledge that such items were characteristic of credit card skimming, the facts and circumstances within Davies'

---

issue for Fourth Amendment issues. Rusher, 966 F.2d at 875 (making standing determination on the basis that husband had no interest in privacy in his wife's purse).

[32] Defendants allege that Davies' credibility on this issue is "suspect" because his testimony "suggested that the bag was immediately behind the front passenger seat. (Tr. 135). He told his supervisor, however, that the bag was located between the two rear seats. (Tr. 232)." (G/M Supp. Reply 17-8). There is no inconsistency between a bag being both behind a passenger seat and between two rear seats.

knowledge and of which he had reasonably trustworthy information (having personally observed the contents of the bag) would warrant a man of reasonable caution in the belief that an offense had been or was being committed, establishing probable cause.

## D. Upon establishment of probable cause, the search of Ghazaryan's person was valid as a search incident to arrest

### 1. Applicable legal standards

When officers have probable cause to arrest, they may conduct a full-body search, including pockets and clothing. United States v. Robinson, 414 U.S. 218 (1973). No additional cause or reasonable suspicion is needed to justify this search. Id. An officer may search incident to arrest before formally arresting the defendant, although everything must be part of one transaction or encounter, and the officer must thereafter arrest the suspect for the crime which provided justification prior to his search, rather than arresting on the basis of probable cause acquired during the search. Rawlings v. Kentucky, 448 U.S. 98 (1980).

### 2. Application to facts

Once Davies recognized the contents of the plastic bag and the significance of its contents, and communicated that information to Hanrahan, the deputies had probable cause to

arrest both Ghazaryan and Margaryan. Accordingly, the officers were entitled to conduct a full-body search of either man, including a search of their pockets and clothing. It is irrelevant that such search was conducted before either man was formally placed under arrest, because probable cause to arrest on the crime for which both men were eventually arrested was established before the search took place.

Defendants argue that the "government's assertion that the search of Ghazaryan was incident to arrest is belied by" the deputies' testimony that defendants were merely detained. However, it is irrelevant for exclusionary rule purposes whether officers characterize an intrusion as a stop or an arrest. Dunaway, 442 U.S. at 200; Elston, 479 F.3d at 319.

Defendants further suggest that the search of Ghazaryan exceeded the scope of a Terry frisk for weapons. (G/M Supp. Mem. 26) (relying on Minnesota v. Dickerson, 508 U.S. 366 (1993)). This Terry argument is beside the point, because the officers had probable cause to arrest Ghazaryan. Moreover, even if the deputies only had reasonable suspicion of credit card skimming at this point, cards are "obvious contraband" when officers have reasonable suspicion of credit card skimming,[33] because in the

---

[33] Such that an officer would only need reasonable suspicion to pull cards from a defendant's clothing, rather than relying on

context of a skimming investigation an officer would recognize that such cards were contraband. United States v. Wen Bin Chen, 811 F. Supp. 2d 1193, 1201-02 (M.D.N.C. 2011).

**E. Following establishment of probable cause, the search of the van was valid under the automobile exception or is otherwise not subject to the exclusionary rule due to a combination of the inevitable discovery rule and inventory search exception**

### 1. Applicable legal standards

The "automobile exception" provides that, when officers have probable cause to believe that a car contains evidence of a crime, the officers may search the parts of the car which might conceal that particular kind of evidence. Chambers v. Maroney, 399 U.S. 42, 90 S. Ct. 1975, 26 L. Ed. 2d 419 (1970).[34]

The "inventory exception" is another recognized exception to the warrant requirement. United States v. Banks, 482 F.3d

---

the search incident to arrest exception to the warrant requirement.

[34] As a note, Arizona v. Gant does not apply, though the Government originally argued that it does. (Gov't's Suppression Resp. 20) (referencing Arizona v. Gant, 556 U.S. 332, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009)). Under Gant, police may search a vehicle incident to a recent occupant's arrest when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search. Both Ghazaryan and Margaryan were handcuffed and in squad cars when the officers began the search (Gov't's Suppression Resp.. 7; G/M Suppression Mem. 3), making Gant inapplicable.

733, 738-39 (4th Cir. 2007) (citing <u>South Dakota v. Opperman</u>, 428 U.S. 364, 374-76 (1976)).

> For the inventory search exception to apply, the search must have "be[en] conducted according to standardized criteria," such as a uniform police department policy, ... and performed in good faith .... "The existence of ... a [standardized criteria] may be proven by reference to either written rules and regulations or testimony regarding standard practices." ... To justify a warrantless search, standardized criteria must sufficiently limit a searching officer's discretion to prevent his search from becoming "a ruse for a general rummaging in order to discover incriminating evidence."

<u>United States v. Matthews</u>, 591 F.3d 230, 235 (4th Cir. 2009) (internal citations omitted).

The "inevitable discovery" doctrine provides that "evidence unlawfully obtained is admissible '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" <u>United States v. Thomas</u>, 955 F.2d 207, 209 (4th Cir. 1992) (quoting <u>Nix v. Williams</u>, 467 U.S. 431, 443 (1984)). "[T]he premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence. Only then, if it can be shown that the taint did not extend to the second search, would the product of the second search be admissible." <u>Thomas</u>, 955 F. 2d at 209

(quoting United States v. Whitehorn, 813 F.2d 646 (4th Cir. 1987), cert. denied, 487 U.S. 1234 (1988)).

### 2. Application to facts

Because Ghazaŕyan and Margaryan did not have permission of the owner to be in the vehicle and because the initial stop was valid, they cannot challenge the subsequent search of the van or the seizure of anything within it. Nevertheless, even if defendants had standing, the search of the car and the seizure of the items was legal.

In this case, the stop resulted in plain view observation of one bag full of evidence that pointed to the crime of credit card skimming. This gave the deputies probable cause to believe that the rest of the car would also contain evidence of a crime, and entitled the deputies to search sections of the car that might conceal more of that particular kind of evidence under the automobile exception. Chambers, 399 U.S. at 42. Because some of the evidence of credit card skimming was apt to be quite small (whole or cut-up cards, cut-up ATM receipts), the officers were entitled to search practically any compartment in the car.

Even if the automobile exception did not apply, the search of the vehicle would be non-excludable through the joint operation of the inevitable discovery doctrine and the inventory exception to the warrant requirement. It was Rickens's

uncontroverted testimony that his office routinely impounds the vehicles of those who are arrested, and that his office routinely searches impounded vehicles.[35] (Tr. 214:25-217:18). The Government accordingly met its burden to establish by a preponderance that the evidence ultimately and inevitably would have been discovered by lawful means, Thomas, 955 F.2d at 209, even if the deputies had not searched the van prior to issuance of a warrant.

**F. Conclusion**

For the reasons set forth above, Defendants Ghazaryan and Margaryan's MOTION TO SUPPRESS EVIDENCE WITH INCORPORATED REQUEST FOR FRANKS HEARING (Docket No. 37), Defendants Ghazaryan and Margaryan's SUPPLEMENTAL MOTION TO SUPPRESS (Docket No. 59), and Defendants Ghazaryan and Margaryan's SECOND SUPPLEMENTAL MOTION TO SUPPRESS (Docket No. 70) have been denied.

## AVAGYAN: STOPS, SEIZURE, AND SEARCH

By contrast, Avagyan's encounter with the officers lacked reasonable, articulable, personalized suspicion from the beginning, and the officers did not obtain probable cause before exceeding the bounds of a Terry stop. For this reason, all items

---

[35] Such a policy is not at all unusual.

and statements obtained from the search and seizure of Avagyan will be suppressed. Avagyan's identity – as an abstract concept, not his identification cards – will not be suppressed.

## A. Avagyan was improperly stopped

### 1. Applicable legal standards

A Terry stop requires reasonable, articulable, personalized suspicion of criminal activity.

> To justify a stop, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." ... The officer must have "reasonable and articulable suspicion that the person seized is engaged in criminal activity." ... "The level of suspicion must be a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" ...

Slocumb, 804 F.3d at 682. A person may be stopped

> when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen .... Where ... physical force is absent, a seizure requires both a "show of authority" from law enforcement officers and "submission to the assertion of authority" by the defendant ....

Stover, 808 F.3d at 995.

Some factors that indicate a reasonable person would not feel free to disregard the police and go about his business include: (1) the defendant's un-coerced consent; (2) the

location of the interaction; (3) how closed off or isolated the defendant and officer are at the time of the stop; (4) whether the officer brandished a weapon; (5) whether the officer used threats or commands or an authoritative tone of voice; (6) whether the officer used intimidating movements; (7) whether the officer used force; and (8) whether the interaction took place in a public location. Drayton, 536 U.S. at 194; Bostick, 501 U.S. at 429. Failure to inform a defendant of his right to refuse does not transform an interaction into a stop. Drayton, 536 U.S. at 194.

### 2. Application of facts

At the very latest, Avagyan was stopped when the deputies handcuffed him and escorted him out of Scafa's Restaurant (Tr. 189:15-190:4), either because (1) the use of handcuffs constituted use of physical force or (2) the use of handcuffs constituted a show of authority and Avagyan leaving the restaurant with the officers constituted submission to that authority.

The record before the Court does not demonstrate that the officers had reasonable, articulable, particularized suspicion, Stover, 808 F.3d at 995, to initiate a stop at that point. As noted in the discussion of the motions filed by Ghazaryan and Margaryan, the Wells Fargo Bank report of men rotating between

banks, coupled with the deputies' knowledge that such behavior was characteristic of credit card skimming, provided reasonable, articulable suspicion that criminal activity was afoot. The Wells Fargo report's identification of a particular van as the base for this activity provided the particularized suspicion that Ghazaryan and Margaryan – the van's occupants – had engaged in the criminal activity in question. The record contains nothing linking Avagyan to the alleged criminal activity – it entirely lacks evidence of particularized suspicion with regard to Avagyan.

First, the "tip" from the unspecified "passerby" lacks the required indicia of reliability. In contrast to Morton, 400 F. Supp. 2d at 875-76, discussed previously, the record is devoid of any information about the identity of the source who reported Avagyan's location at Scafa's. (Tr. 186:20-188:22). Second, the record does not show Avagyan engaging in any criminal or even suspicious activity. The tip is, accordingly, more analogous to the tip in Florida v. J.L., 529 U.S. at 266, where an unidentified source provided a physical description of the defendant and claimed that the defendant was engaged in the commission of a crime.

Additionally, although the Wells Fargo Bank call provided reasonable, articulable suspicion that criminal activity was

afoot, nothing in the record adequately connected Avagyan to the suspicious activity reported in the call other than his race and the fact that he was in the shopping center where Ghazaryan and Margaryan were found in the identified vehicle. Unlike Ghazaryan and Margaryan, who were found in the Honda identified in the dispatch call, the deputies lacked any reason to believe that Avagyan was one of the Middle Eastern men identified in the Wells Fargo call other than his race – that is, they lacked the particularized suspicion required to stop Avagyan. Any contrary conclusion would render the "particularized" requirement of Slocumb a nullity.

This lack of reasonable, articulable, particularized suspicion might be overcome if there was any evidence in the record of why Horn, the officer who first encountered Avagyan, believed that Avagyan's "actions made him very suspicious." (Tr. 201:2-204:13). However, the Government did not call Horn to testify, and Davies could not testify as to the basis for Horn's conclusion. (Tr. 201:2-204:13). Although courts typically defer to an officer's training and experience when an officer concludes that certain behaviors were suspicious, there is absolutely no record of any behavior by Avagyan other than the evidence that he was sitting in Scafa's, let alone any testimony about why such behavior was suspicious. A mere assertion that

60

Avagyan was suspicious, recited by a non-testifying officer to a testifying officer, does not meet even the minimal level of objective justification required for a Terry stop.

## B. Avagyan's interaction quickly became an arrest and search unsupported by probable cause

Even presuming that the deputies' interaction with Ghazaryan began with reasonable suspicion, such that it was justified as a Terry stop, the encounter quickly exceeded the bounds of a Terry stop and became a full-fledged search and arrest.

### 1. Applicable legal standards

#### a. A Terry stop becomes a seizure when it becomes unnecessarily long, or when it exhibits other characteristics of a formal arrest

It is irrelevant for exclusionary rule purposes whether officers characterize an intrusion as a stop or an arrest. Dunaway, 442 U.S. at 212; Elston, 479 F.3d at 319.

A stop becomes a seizure when it goes too far in scope. Dunaway, 442 U.S. at 210 ("Because Terry involved an exception to the general rule requiring probable cause, this Court has been careful to maintain its narrow scope.").

Duration is typically the key to a stop transforming into an arrest; however, moving a suspect also contributes to a

finding that a stop has become an arrest. Sharpe, 470 U.S. 675 (1985) (finding twenty-minute detention reasonable where officers worked with diligence and without delay; noting that ten minutes might be too long for a stop in a resource-rich community and thirty-five minutes might be a perfectly acceptable stop in a resource-poor community); Royer, 460 U.S. at 491 (finding that police exceeded the limits of an investigative stop where they asked defendant to accompany them to a small police room); Dunaway, 442 U.S. at 200 (finding that defendant being taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room was functionally an arrest). As noted in Royer, "there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention .... There is no indication in this case that such reasons prompted the officers to transfer the site of the encounter from the concourse to the interrogation room." Royer, 460 U.S. at 504-05. The same is true of this record.

Although case law indicates that it is sometimes permissible to handcuff a defendant during a Terry stop, the most precise description of case law is that it is permissible to handcuff a defendant during a Terry stop when the officer articulates a safety concern. Certainly, "a brief but complete

restriction of liberty is valid under Terry," such that handcuffing a defendant does not, without more, establish that a defendant was arrested. United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995) (noting that handcuffing a suspect and placing a suspect in a patrol car for questioning does not, by itself, impermissibly expand the scope of a Terry stop); see also Smith, 994 F. Supp. 2d at 762. However, in Leshuk, the court explicitly noted that the officers' actions "amounted to a limited Terry stop necessary to protect their safety, maintain the status quo, and confirm or dispel their suspicions." Leshuk, 65 F.3d at 1110 (emphasis added). This is consistent with Royer, which noted that, although moving a suspect could be justified by safety or security interests in some cases, the record contained no evidence that safety or security was at issue in that case; in other words, because the officers did not articulate any security concern, there was no justification for expanding the scope of a Terry stop by moving the suspect. Royer, 460 U.S. at 504-05. It is also consistent with Muehler v. Mena, 544 U.S. 93, 94 (2005), which recognized that it is reasonable for a SWAT team executing a "high risk" warrant in a house suspected of housing armed gang members to handcuff persons found in the house for several hours while conducting a search, and stressing that "the risk of harm to officers and

63

occupants is minimized "if the officers routinely exercise unquestioned command of the situation" and that in gang-related searches "the use of handcuffs minimizes the risk of harm." Muehler, 544 U.S. at 99 (relying on Michigan v. Summers, 452 U.S. 692 (1981) (recognizing that "minimizing the risk of harm to officers" is a significant reason to permit detention of residents while executing a search warrant)); see also Rodriguez, 135 S. Ct. at 1614 (noting that, in the context of traffic stops, the tolerable scope of a stop is related to the scope of legitimate safety concerns). The most specific rule is, therefore, that transporting and handcuffing a suspect does not impermissibly extend a Terry stop when the officers articulate a legitimate safety concern.

### b. A Terry frisk becomes a search when it goes beyond "plain feel"

Although Terry permits officers to carry out a limited frisk for weapons, the frisk must be limited to "plain feel," or it becomes a search. A frisk is limited to what is necessary for the discovery of weapons, although an officer may pull out clear contraband that he felt during a Terry frisk without manipulating the object. Dickerson, 508 U.S. at 366.

> Under Terry, once an officer has a
> reasonable, articulable suspicion that the
> detained individual may be armed, he may
> search that individual for weapons. Terry,

> 392 U.S. at 24, 88 S.Ct. 1868 .... During a permissible pat-down, however, an officer may also seize any object "whose contour or mass makes its identity immediately apparent" as contraband, whether threatening or non-threatening in nature, under the "plain view"—or its corollary, the "plain feel"—doctrine. Dickerson, 508 U.S. at 373, 375-76, 113 S.Ct. 2130; United States v. Hernandez-Mendez, 626 F.3d 203, 213 (4th Cir.2010), cert. denied .... As the Supreme Court noted, "Terry itself demonstrates that the sense of touch is capable of revealing the nature of an object with sufficient reliability to support a seizure." Dickerson, 508 U.S. at 376, 113 S.Ct. 2130.

Wen Bin Chen, 811 F. Supp. 2d at 1200-02.[36] "However, once an officer has determined that the object is not a weapon and its shape or size does not indicate its contraband nature, the search must stop," United States v. Works, 338 F. App'x 295, 299 (4th Cir. 2009), or the frisk becomes a search, which must be supported by probable cause.

### c. Probable cause

"Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had

---

[36] As discussed supra, Wen Bin Chen makes a compelling argument that, when officers have reasonable, articulable, particularized suspicion of credit card skimming, a stack of cards may be contraband by "plain feel." Wen Bin Chen, 811 F. Supp. 2d at 1201-02. However, even a Terry frisk requires reasonable, articulable, particularized suspicion, and, as discussed earlier, the officers had no particularized suspicion that Avagyan had committed any crime at all.

reasonably    trustworthy    information    (are)    sufficient    in
themselves to warrant a man of reasonable caution in the belief
that' an offense has been or is being committed." Brinegar, 338
U.S. at 175-76 (internal citation omitted).

## 2. Application to facts

The deputies handcuffed Avagyan and placed him in a squad
car, a development which is characteristic of arrest and which
was unsupported by any articulated safety concerns. At this
point, Avagyan was arrested. As noted above, the deputies lacked
reasonable suspicion to stop Avagyan in their initial encounter.
At the time that Avagyan was handcuffed and removed from
Scafa's, the record contains no evidence that Avagyan had done
anything to establish reasonable suspicion, much less to elevate
that reasonable suspicion to probable cause. Avagyan's arrest
was unwarranted, and any unattenuated fruits must be suppressed.

The Government relies on Leshuk for the notion that a brief
but complete restriction of liberty, including handcuffing a
suspect or placing that suspect in a squad car, does not
impermissibly extend the scope of a Terry stop. As discussed
above, this misses that case law more accurately permits
handcuffing and transportation during a Terry stop when the
officers articulate a safety concern. No such particularized
concern regarding Avagyan appears in the record, such that the

66

record offers no justification for moving the apparently unthreatening Avagyan from his seat in Scafa's. The Government argues that Basil was "not required to allow Avagyan to escape before conferring with the other deputies." (Gov't's Avagyan Supp. Opp. 11). That is true, but beside the point. Basil was not required to allow Avagyan to escape — but under Royer, Basil was also not permitted to transport Avagyan across the shopping center in handcuffs without either (1) probable cause or (2) reasonable, articulable, particularized suspicion that Avagyan had committed a crime plus an articulable safety concern.

Moreover, even if handcuffing and transporting Avagyan did not amount to an arrest, the deputies' search of Avagyan went beyond the "plain feel" bounds of a Terry frisk and became a search. Dickerson, 508 U.S. at 366. Avagyan's wallet and the bills were not obviously contraband[37] in the circumstances stated in the record, such that withdrawing them from Avagyan's person went beyond plain feel. A search requires probable cause to

---

[37] A wad of cash may be clearly identifiable contraband when the police have reasonable, articulable, personalized suspicion that the cash is evidence of a crime. United States v. Cervantes, 19 F.3d 1151, 1153 (7th Cir. 1994) (holding that "although a wad of cash is not in itself a suspicious object," when the police have good reason to believe the cash on a defendant's person was just obtained in exchange for illegal drugs, it is "suspicious," and finding that police had probable cause to seize said wad of cash under the plain view doctrine). Cervantes is inapplicable because, again, the deputies lacked particularized suspicion that Avagyan was involved in any crime at all.

arrest, see, e.g., Rawlings, 448 U.S. at 98, and, as previously discussed, the deputies lacked such probable cause. As such, even if handcuffing and moving Avagyan were not an arrest, the items removed from Avagyan during the warrantless search of his person must be suppressed.

## C.  Attenuation  does  not  protect  the  items  or  statements collected

The Government argues that an "intervening act of free will can purge the primary taint of unlawful invasion." (Gov't's Avagyan Supp. Opp. 13-14) (relying on Brown v. Illinois, 422 U.S. 590, 603 (1975); Wong Sun v. United States, 371 U.S. 471, 485 (1963)). Per Brown, there are three factors for determining attenuation: (1) time elapsed between the illegality and the acquisition of the evidence, (2) the presence of intervening circumstances, and (3) the purpose and flagrancy of the official misconduct. Brown, 422 U.S. at 603. The Government admits that the time between the illegal stop-turned-arrest and Avagyan's statements was short. However, the Government still contends the officers did not act with flagrant disregard for Avagyan's rights, and that the subsequent Miranda warning of Avagyan by Basil purged the primary taint of any unlawful stop or arrest. (Gov't's Avagyan Supp. Opp. 13-14) (relying on Kaupp v. Texas,

68

538 U.S. 626, 633 (2003); <u>United States v. Sanders</u>, 954 F.2d 227, 231 (4th Cir. 1992)).

<u>Kaupp</u> clearly states, however, that "<u>Miranda</u> warnings, <u>alone</u> and <u>per se</u>, cannot always … break, for Fourth Amendment purposes, the causal connection between the illegality and the confession." <u>Kaupp</u>, 538 U.S. at 633 (relying on <u>Brown</u>, 422 U.S. at 603).[38] <u>Kaupp</u> also stressed that there must be a "meaningful intervening event" – which, in context, the Court clearly meant must be an event other than the issuance of <u>Miranda</u> warnings – to purge the taint of an illegal search. The fact that there is no evidence of deliberate misconduct cannot overcome the fact that the other two elements – the lack of a significant intervening circumstance and the short intervening period of time – point strongly against attenuation. On this record, the Government has failed to meet its burden of establishing attenuation.

---

[38] As <u>Brown</u> and Avagyan point out, allowing <u>Miranda</u> warnings, without more, to purge the taint of an illegal arrest would allow officers to make illegal arrests, give <u>Miranda</u> warnings, and escape the effects of the exclusionary rule. <u>Brown</u>, 422 U.S. at 601-03.

**D. Evidence of Avagyan's identity may be suppressed; Avagyan's identity itself cannot be suppressed**

Avagyan seeks to suppress both his driver's license and the very fact of his identity. The former is suppressible, the latter is not.

The Government argues that it was entitled to seize Avagyan's driver's license because law enforcement questions concerning a suspect's identity are a routine part of Terry stops. (Gov't's Avagyan Supp. Opp. 12) (relying on Hiibel v. Sixth Judicial Dist. Court of Nev., Humbolt County, 542 U.S. 177, 186 (2004)); see also Rusher, 966 F.2d at 876-77 (recognizing that, during a routine traffic stop, an officer may request identification and registration). However, Hiibel and Rusher speak to an officer's authority to request identification – not to stick his hands into a suspect's clothing and withdraw his wallet. Such an intrusion is a clear contravention of the "plain feel" doctrine of Dickerson. Because the officers obtained Avagyan's identification card through an illegal search of Avagyan's person, rather than by requesting Avagyan's identification, that identification card will be suppressed.

However, Avagyan cannot suppress his identity as an abstract concept. It is a well-established rule that the exclusionary rule does not extend to suppression "of the body of

the defendant and the fact of his identity." United States v. Oscar-Torres, 507 F.3d 224, 229 (4th Cir. 2007). Although physical evidence related to identity (fingerprints in Oscar-Torres, a driver's license in this case) may be suppressed, a person's identity is not subject to suppression. Id.

## E. Conclusion

For the reasons stated above, Defendant Avagyan's MOTION TO SUPPRESS EVIDENCE WITH INCORPORATED REQUEST FOR FRANKS HEARING (Docket No. 39) and Defendant Avagyan's SUPPLEMENTAL MOTION TO SUPPRESS (Docket No. 58) are granted in part and denied in part. Avagyan is entitled to suppression of statements and physical things, including his driver's license, but not to the fact of his identity.

It is so ORDERED.

/s/   _REP_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February 22, 2016